# In the United States Court of Federal Claims

No. 14-627T
(Filed: September 29, 2015)

```
*************************************
DIVERSIFIED GROUP, INC. et al.,      *
                                     *        RCFC 12(b)(1); Subject Matter Jurisdiction;
               Plaintiffs,           *        Tax Shelter; Full Payment Rule; Penalty;
                                     *        26 U.S.C. § 6111; 26 U.S.C. § 6707;
v.                                   *        Aggregate; Divisibility; Abatement;
                                     *        Son-of-BOSS; Option Partnership
THE UNITED STATES,                   *        Strategy; Financial Derivatives Investment
                                     *        Strategy
               Defendant.            *
*************************************
```

Jasper G. Taylor, III, Houston, TX, for plaintiffs.

Sarah S. Marshall, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

     Before the court is defendant's motion to dismiss plaintiffs' complaint for lack of subject matter jurisdiction. Plaintiffs, James Haber and his company, Diversified Group, Inc. ("DGI"), seek a refund of their partial payment of a federal tax penalty, which the Internal Revenue Service ("IRS" or "Service") assessed because of plaintiffs' failure to register their tax shelter, as required by the pertinent statute, 26 U.S.C. § 6111. In addition, plaintiffs request injunctive relief against the IRS's collection efforts. In the alternative, plaintiffs argue that if they are subject to a penalty, the methodology employed by the IRS in calculating the penalty was incorrect. Because plaintiffs failed to pay the full amount of the penalty assessed against them before filing their refund suit, the court lacks subject matter jurisdiction over the complaint. Accordingly, defendant's motion is granted.

## I. BACKGROUND

     DGI is a boutique merchant banking firm, and Mr. Haber is its president. Between 1999 and 2002, DGI created a tax shelter in which 193 of its clients participated. The tax shelter consisted of plaintiffs arranging and overseeing transactions for these 193 clients; some of the transactions were accomplished utilizing an option partnership strategy ("OPS"), while others were accomplished using a financial derivatives investment strategy ("FDIS").[1] The respective

---

    [1] An OPS consists of option deals. "An option is a contract that gives its buyer the right, but not the obligation, to buy or sell an asset at a predetermined 'strike' price at some point in the

transactions that plaintiffs arranged for two of their clients–Albert Kotite and Stanley J. Dziedzic–are described below.

## A. The OPS Transaction Involving Mr. Kotite

On November 10, 2000, DGI oversaw some business deals into which a limited liability company wholly owned by Mr. Kotite ("Kotite LLC") entered.  The Kotite LLC purchased a long option from, and also issued a short option to, Lehman Brothers Commercial Corporation ("Lehman").  According to the terms of the long option, the Kotite LLC paid Lehman $1,750,000 in exchange for a payoff.  The terms of the short option consisted of Lehman paying the Kotite LLC $1,715,000 in exchange for a payoff.  The options would expire on December 15, 2000.  The Kotite LLC paid Lehman only $35,000, the amount that Mr. Kotite had previously contributed to the Kotite LLC.  Before the options expired, Mr. Kotite "assigned the sole membership interest in the [Kotite] LLC to Hanover North Fund LLC ("Hanover") in exchange for a pro-rata membership interest in Hanover."  Compl. ¶ 39.  Then, on December 14, 2000, Mr. Kotite resigned as a member of Hanover and sold his interest in the company, for which he received payment in Canadian dollars.  He later sold the Canadian dollars for United States dollars, taking a loss as a result of that transaction because, at that time, the exchange rate for Canadian dollars to United States dollars was less favorable.  On his 2000 federal income tax return, Mr. Kotite represented that his basis in his interest in Hanover was increased by the $1,750,000 long option, without accounting for the reduction by the short option premium.  He further represented that upon selling his member interest in Hanover, he received foreign currency "whose cumulative basis equaled his outside basis in Hanover"; he thus claimed a loss with respect to selling his foreign currency for United States dollars.  Id. ¶ 42.

## B. The FDIS Transaction Involving Mr. Dziedzic

---

future."  Markell Co. v. Comm'r, No. 20551-08, 2014 WL 1910052, at *1 n.2 (T.C. May 13, 2014).  More specifically, "[a] short option gives its buyer a right to sell the asset; a long option gives its buyer a right to buy the asset."  Id. at *1.  In this case, plaintiffs marketed to their clients a complex plan involving the purchase and sale of options; overall, this plan was an OPS.  When carrying out the commercial dealings that were necessary to effectuate participation in their OPS, plaintiffs "creat[ed] deals . . . generat[ing] enormous capital losses . . . [that] offset the corporate-level tax on capital gains, . . . thereby largely eliminat[ing] corporate-level taxes" for their clients.  Id.  These transactions "involved the purchase and sale of offsetting foreign currency options (in the form of European style digital options)[,] and the options' contribution into partnerships formed and managed by Mr. Haber."  Pls.' Resp. Ex. 1 at 26.  Overall, the "OPS [that plaintiffs created] was a carefully designed series of pre-planned steps with the sole goal of generating a tax loss."  Id.  Similarly, the FDIS that plaintiffs engaged in "resulted in non-economic tax losses flowing to the clients in order to offset their taxable income and reduce their income tax liabilities."  Pls.' Resp. Ex. 2 at 38.  The steps that were attendant to participation in the FDIS were similar to those of the OPS, but were more complicated in some respects.  Id. at 6. For example, the buying and selling of assets necessary to accomplish participation in the FDIS involved a foreign partner, whereby the majority of the gains went to the foreign partner, while the majority of the losses went to the client, to enable the client to claim a tax loss.

On November 9, 2001, DGI oversaw certain business deals into which SJD Trading LLC ("SJD Trading") entered.  SJD Trading was wholly owned by Mr. Dziedzic, which he had capitalized with $15,000.  SJD Trading purchased a long option from Refco Capital Markets, Ltd. ("Refco"), and issued a short option to Refco.  Under the terms of the long option, SJD Trading paid Refco "a $1.5 million premium in exchange for a payoff of $5,009,024."  Id. ¶ 45.  Under the terms of the short option, Refco paid SJD Trading "a $1,485,000 premium in exchange for a payoff of $4,970,951."  Id. ¶ 46.  Before the options expired on January 8, 2002, "SJD Trading paid Refco only the net premium of $15,000, the amount [that Mr.] Dziedzic had previously contributed to SJD Trading."  Id. ¶ 47.  On November 16, 2001, Mr. Dziedzic "assigned the sole membership interest in SJD Trading[,] along with $14,050 in cash[,] to SJD Investments, LLC [("SJD Investments"),] in exchange for 5% of the common member interests and 96.54% of the preferred member interests."  Id. ¶ 48.  A foreign individual owned 95% of the common member interests in SJD Investments.  SJD Investments then entered into several additional options positions.  On November 27, 2001, SJD Investments disposed of the options that had increased in value, and on December 3, 2001, Mr. Dziedzic purchased all but five percent of the foreign individual's member interests for $950.  On December 17, 2001, SJD Investments disposed of the options that had declined in value.  SJD Investments "allocated the bulk of the recognized gain to the foreign individual[,] and the bulk of the recognized loss to [Mr.] Dziedzic."  Id. ¶ 54.  On his 2001 federal income tax return, Mr. Dziedzic represented that his "outside basis in SJD [Investments] equaled the premium for the long option," without accounting for the short option premium, and deducted the loss allocated to him.  Id. ¶ 55.

## C.  Plaintiffs' IRS Audit and Resulting Penalty

On or about March 14, 2002, the IRS notified DGI that, pursuant to 26 U.S.C. § 6707, it was commencing a penalty audit of DGI for its failure to register its tax shelter, which was composed of the 193 transactions that it arranged for its clients in order to accomplish their participation in either the OPS or FDIS plan.  Thereafter, the IRS issued information document requests and five summonses.  In January or February 2003, DGI produced twenty to thirty boxes of material, including closing binders for various transactions.  On February 27 and 28, 2003, the IRS deposed Mr. Haber "in connection with the boxes of material that had been produced."  Id. ¶ 12.  In July 2003, DGI produced additional documents.  Then, in March 2004, the IRS notified Mr. Haber that it was "expanding the Penalty Audit to include him."  Id. ¶ 14.

Ultimately, on May 9, 2013, nine years after Mr. Haber received notice from the Service that the scope of the penalty audit had been expanded to include him, the IRS sent to each plaintiff a nearly identical Notice of Proposed Adjustment ("NOPA"), indicating a $42,109,483 total penalty for failure to register the tax shelter.  This penalty was the result of adding a $24,868,451 penalty for the transactions that composed plaintiffs' OPS, and a $17,241,032 penalty for the transactions that constituted plaintiffs' FDIS.  Pls.' Resp. Ex. 1 at 21.  On or about December 16, 2013, the IRS sent to each plaintiff a revised NOPA and two NOPA schedules reflecting the same total penalty of $42,109,483.  A cover letter accompanied each of the two NOPA schedules.  Each letter indicated that the taxpayer had thirty days to request a conference with the IRS.  Neither plaintiff requested a conference.

Subsequently, on or about January 16, 2014, the IRS sent plaintiffs a letter with an updated calculation of the penalty.  Pls.' Resp. Ex. 4 at 60.  In the letter, the IRS acknowledged

that of the original $42,109,483 penalty, $17,188,579 had been "[p]aid by [o]thers," reduced the net unpaid penalty amount to $24,920,904 ("$24.9 million"), and advised that plaintiffs were "joint[ly] and several[ly] liab[le]" for the penalty.  Id.  The penalty assessed reflected "1 percent of the aggregate amount invested in [the] tax shelter" by plaintiffs' clients.  Pls.' Resp. Ex. 1 at 49.  The IRS provided plaintiffs with a breakdown of its calculation of the $24.9 million penalty. Specifically, the IRS supplied plaintiffs with charts that listed each individual client's aggregate investment in the tax shelter, the calculation of one percent of each separate aggregate investment, and the combined total of the latter, which constituted the penalty.[2]  Id. at 55; Pls.' Resp. Ex. 2 at 1-2, 43-45.

Each plaintiff received a notification on or about February 21, 2014, requiring payment of the penalty.  In response, on or about February 28, 2014, each plaintiff selected one client's aggregate investment from the chart, and then paid one percent of that aggregate investment, plus interest.  Specifically, Mr. Haber paid $18,310, or one percent of Mr. Kotite's aggregate investment in the tax shelter, and DGI paid $15,450, or one percent of Mr. Dziedzic's aggregate investment in the tax shelter.  DGI and Mr. Haber also paid interest in the amounts of $50 and $60, respectively.  By making these payments, plaintiffs paid one percent of two clients' respective aggregate investments, in total, and not the amount demanded by the IRS, which was the combined total of one percent of all of plaintiffs' 193 clients' aggregate investments. Plaintiffs refer to each instance in which a client participated in the tax shelter as a transaction, and therefore aver that they paid the penalty for two such transactions. Compl. ¶¶ 23-25.

Concurrently with these payments, each plaintiff filed a refund claim with the IRS.  The IRS denied these refund claims in separate letters dated April 10, 2014, advising plaintiffs that the "penalty is not assessed on each individual transaction, but instead assessed based on the aggregate amount invested in the tax shelter, or the aggregate amount of fees paid to promoters of the tax shelter . . . .  Thus, [the] penalties are non-divisible and must be paid in full before commencing a refund suit."[3]  Id. ¶ 28.

## II.  PROCEDURAL HISTORY

On July 18, 2014, plaintiffs filed suit in the United States Court of Federal Claims ("Court of Federal Claims").  Plaintiffs claim that they are entitled to a refund of federal income tax penalties erroneously and illegally assessed and collected from them, along with interest assessed on the penalty amount collected, plus overpayment interest.  Alternatively, plaintiffs argue, even if a penalty is warranted, it was not properly calculated.  Finally, plaintiffs request abatement of any uncollected assessments of the penalty, which is tantamount to a request for the court to enjoin the IRS's collection efforts against plaintiffs.  Defendant filed a motion to dismiss

---

[2]  The IRS provided this breakdown in two charts—one chart outlined this information with respect to 103 of plaintiffs' clients, and a second chart laid out this information regarding the remaining 90 clients.

[3]  Although plaintiffs quote portions of the letters that they received from the IRS in their complaint, they did not attach those letters as exhibits.  Nonetheless, for purposes of resolving defendant's motion to dismiss for lack of subject matter jurisdiction, the court will assume as true plaintiffs' representations.

plaintiffs' complaint pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") based upon plaintiffs' failure to satisfy the full payment rule, the predicate to invoking this court's jurisdiction. Defendant's motion has been fully briefed, and oral argument was held on July 29, 2015.

## III.  LEGAL STANDARDS

### A.  RCFC 12(b)(1)

Defendant moves to dismiss plaintiff's complaint pursuant to RCFC 12(b)(1) for lack of subject matter jurisdiction. When resolving an RCFC 12(b)(1) motion, the court "must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011) (citing Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995)). If the court determines that the factual allegations set forth in the complaint are insufficient to resolve the jurisdictional dispute, then it may consider relevant evidence beyond the pleadings. See Fisher v. United States, 402 F.3d 1167, 1181-83 (Fed. Cir. 2005) (panel portion).

Whether the court has jurisdiction to decide the merits of a case is a threshold matter. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998). "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868). The parties, or the court sua sponte, may challenge the existence of subject matter jurisdiction at any time. Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006). The plaintiff bears the burden of proving, by a preponderance of the evidence, that the court possesses subject matter jurisdiction. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Brandt v. United States, 710 F.3d 1369, 1373 (Fed. Cir. 2013); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). The plaintiff cannot rely solely on allegations in the complaint, but must bring forth relevant, adequate proof to establish jurisdiction. See McNutt, 298 U.S. at 189. Ultimately, if the court finds that it lacks subject matter jurisdiction, then it must dismiss the claim. RCFC 12(h)(3); Matthews v. United States, 72 Fed. Cl. 274, 278 (2006).

### B.  Jurisdiction

The Court of Federal Claims is a court of limited jurisdiction. Jentoft v. United States, 450 F.3d 1342, 1349 (Fed. Cir. 2006) (citing United States v. King, 395 U.S. 1, 3 (1969)). The scope of this court's jurisdiction to entertain claims and grant relief depends upon the extent to which the United States has waived its sovereign immunity. King, 395 U.S. at 4. In "construing a statute waiving the sovereign immunity of the United States, great care must be taken not to expand liability beyond that which was explicitly consented to by Congress." Fid. Constr. Co. v. United States, 700 F.2d 1379, 1387 (Fed. Cir. 1983). A waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." King, 395 U.S. at 4. Unless Congress consents to a cause of action against the United States, "there is no jurisdiction in the Court of Claims more than in any other court to entertain suits against the United States." United States

v. Sherwood, 312 U.S. 584, 587-88 (1941).

The Tucker Act confers upon the Court of Federal Claims jurisdiction to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2012). Although the Tucker Act waives the sovereign immunity of the United States for claims for money damages, it "'itself does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages.'" Greenlee County, Ariz. v. United States, 487 F.3d 871, 875 (Fed. Cir. 2007) (quoting Fisher, 402 F.3d at 1172). The separate source of substantive law must constitute a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." Lovelladies Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc). "[I]n order for a claim against the United States founded on statute or regulation to be successful, the provisions relied upon must contain language which could fairly be interpreted as mandating recovery of compensation from the government." Cummings v. United States, 17 Cl. Ct. 475, 479 (1989) (citations omitted), aff'd, 904 F.2d 45 (Fed. Cir. 1990); see also United States v. White Mountain Apache Tribe, 537 U.S. 465, 473 (2005) ("[A] statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages. While the premise to a Tucker Act claim will not be lightly inferred, . . . a fair inference will do.") (citation and internal quotation marks omitted); United States v. Testan, 424 U.S. 392, 398 (1976) (stating that a "grant of a right of action must be made with specificity").

The Court of Federal Claims "may not entertain claims outside this specific jurisdictional authority." Adams v. United States, 20 Cl. Ct. 132, 135 (1990). With the exception of limited situations not relevant in this case, see, e.g., 28 U.S.C. § 1491(a)(2), (b)(2), the Court of Federal Claims lacks jurisdiction to award declaratory or injunctive relief, Bowen v. Massachusetts, 487 U.S. 879, 905 & n.40 (1988); accord Brown v. United States, 105 F.3d 621, 624 (Fed. Cir. 1997) ("The Tucker Act does not provide independent jurisdiction over . . . claims for equitable relief."). Moreover, subject to limited exceptions, federal courts are prohibited from awarding declaratory or injunctive relief by the Anti-Injunction Act. See 26 U.S.C. § 7421(a) (1994 & Supp. IV 1999) ("[N]o suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person . . . ."). Specifically, § 7421(a) "provides that once a tax has been assessed, a taxpayer is powerless to prevent the [IRS] from collecting that tax." Russell v. United States, 78 Fed. Cl. 281, 289 (2007) (citing Stiles v. United States, 47 Fed. Cl. 1, 2 (2000)).

## C. Tax Refund Suits

The Tucker Act provides this court with jurisdiction over tax refund suits. Ontario Power Generation v. United States, 369 F.3d 1298, 1301 (Fed. Cir. 2004); Shore v. United States, 9 F.3d 1524, 1525 (Fed. Cir. 1993); Allison v. United States, 80 Fed. Cl. 568, 580-81 (2008). When a taxpayer is assessed a tax deficiency, he may challenge that assessment in one of two ways. Smith v. United States, 495 F. App'x 44, 48 (Fed. Cir. 2012); Ishler v. United States, 115

Fed. Cl. 530, 536 (2014).  The first is to pay the tax, request a refund from the IRS, and then file a refund suit in the Court of Federal Claims or in a federal district court.  26 U.S.C. § 7422(a); Smith, 495 F. App'x at 48; Ishler, 115 Fed. Cl. at 536.  Alternatively, the taxpayer may file a petition with the United States Tax Court ("U.S. Tax Court" or "Tax Court").  Smith, 495 F. App'x at 48; see also Flora v. United States, 362 U.S. 145, 163 (1960) (describing Congress's creation of "a system" of two tribunals for litigation).  With certain exceptions, if a taxpayer chooses the latter path and files a petition with the Tax Court, that individual cannot later bring suit in the Court of Federal Claims or in a federal district court to obtain a credit or refund for the same taxable year.  26 U.S.C. § 6512(a); Smith, 495 F. App'x at 48.

If the taxpayer chooses the first option and files suit in the Court of Federal Claims, then pursuant to 26 U.S.C. § 6511(a), a "[c]laim for credit or refund of an overpayment of any tax imposed by" the statute where the taxpayer "is required to file a return shall be filed . . . within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later."  Subsection (b)(1) provides that "[n]o credit or refund shall be allowed or made after the expiration of the period of limitation prescribed in subsection (a) for the filing of a claim for credit or refund, unless a claim for credit or refund is filed by the taxpayer within such period."  Id. § 6511(b)(1)(1994).  Subsection (b)(2) defines two look-back periods, and imposes substantive limitations on the amount of the refund a taxpayer can collect.  First, if a claim is filed "during the 3-year period" set forth in 26 U.S.C. § 6511(a), then the amount of the credit or refund "shall not exceed the portion of the tax paid within the period, immediately preceding the filing of the claim, equal to 3 years plus the period of any extension of time for filing the return."  Id. § 6511(b)(2)(A).  Second, if a claim is "not filed within such 3-year period," then the amount of the credit or refund "shall not exceed the portion of the tax paid during the 2 years immediately preceding the filing of the claim."  Id. § 6511(b)(2)(B).  "[U]nless a claim for refund of a tax has been filed within the time limits imposed by § 6511(a), a suit for refund . . . may not be maintained in any court."  United States v. Dalm, 494 U.S. 596, 602 (1990) (citing United States v. Kales, 314 U.S. 186, 193 (1941)).

## IV. DISCUSSION

In their complaint, plaintiffs allege that the IRS assessed a penalty against them pursuant to 26 U.S.C. § 6707 for failure to register their tax shelter, as required by 26 U.S.C. § 6111.  Compl. ¶ 9.  Plaintiffs aver that they are entitled to a tax penalty refund, including interest and costs.  Id. ¶ 1.  Alternatively, plaintiffs claim, if a penalty is warranted, it was not properly calculated by the IRS.  Id. ¶ 66.  Plaintiffs also seek abatement of any uncollected assessments, thus indirectly requesting that this court enjoin the IRS's collection efforts against them.  Id. ¶ 1.

Defendant moves to dismiss plaintiffs' complaint for lack of subject matter jurisdiction.  According to defendant, because plaintiffs have not made full payment of the penalty assessed against them for failure to register the tax shelter, a condition precedent to maintaining a tax refund action in this court, this court is precluded from exercising its jurisdiction over plaintiffs' complaint other than to dismiss it on RCFC 12(b)(1) grounds.  Def.'s Mot. 5.
Plaintiffs dispute the basis of defendant's motion by countering that they have satisfied the full payment rule.  Pls.' Resp. 4.  In support of their jurisdictional argument, plaintiffs advance a novel theory, one that raises an issue of first impression, and that, if accepted, would

carve out a new judicially created exception to the rule requiring full payment of the tax owed prior to filing suit in this court. Although plaintiffs readily acknowledge that they were assessed a $24.9 million penalty for failure to register the tax shelter, id. at 3, they argue that it is not necessary for them to pay the full amount of the penalty prior to bringing suit in this court, id. at 22-23. Rather, plaintiffs contend, the court's sole focus should be each of the 193 individual transactions within the tax shelter. Id. at 20-23. To accomplish participation in their tax shelter, plaintiffs guided 193 clients through multiple steps involving the buying, selling, or otherwise transferring of assets, in order to achieve the desired tax loss. According to plaintiffs' theory, the $24.9 million penalty assessed against them for failure to register their tax shelter is divisible by parsing out each of the 193 clients' individual transactions.[4] Id. at 1, 4, 19-20, 22-23; Oral Argument of Mr. Taylor at 1:25:47-1:26:04, 1:50:08, 2:03:08, 2:04:14. Consequently, plaintiffs contend, paying the discrete penalty assessed on a single transaction is sufficient to satisfy the full payment rule. Pls.' Resp. 1, 4, 9; Oral Argument of Mr. Taylor at 1:25:47-1:26:04, 1:50:54, 1:53:37, 1:54:45. As a result, because Mr. Haber paid $18,310, or one percent of Mr. Kotite's aggregate investment in the tax shelter, and DGI paid $15,450, or one percent of Mr. Dziedzic's aggregate investment in the tax shelter, plaintiffs argue that they have satisfied the full payment rule, thereby establishing this court's jurisdiction. Pls.' Resp. 1, 9.

In ruling on defendant's motion, plaintiffs urge the court to take a broad approach to its jurisdictional analysis, placing heavy reliance on the decisions in Noske v. United States, 911 F.2d 133 (8th Cir. 1990), and Humphrey v. United States, 854 F. Supp. 2d 1301 (N.D. Ga. 2011), to advance their divisibility argument. Pls.' Resp. 18-19; Oral Argument of Mr. Taylor at 1:28:54, 1:29:40. Specifically, plaintiffs argue that Humphrey is analogous to their circumstances because the court in that case found that the penalty for promoting abusive tax shelters under 26 U.S.C. § 6700 is imposed for each activity outlined in § 6700 and is therefore divisible. Pls.' Resp. 18. Further, plaintiffs offer Noske in support of the identical proposition that penalties arising under § 6700 are divisible. Id. at 18-19. Ultimately, plaintiffs contend that this court should apply the same reasoning as in Humphrey and Noske and determine that the tax penalty arising under § 6707, like a § 6700 penalty, is divisible. Id.

In response, defendant contends that plaintiffs' divisibility theory is incorrect because it fails to comprehend the basis for the imposition of the penalty. Def.'s Mot. 5. Defendant explains that this case turns on a single key fact—that the $24.9 million penalty arose as a result of plaintiffs' failure to register the tax shelter. Def.'s Reply 3, 5-7. Defendant contends, therefore, that the penalty is not divisible among plaintiffs' 193 clients or the corresponding number of transactions that constitute the tax shelter. Id. Accordingly, defendant argues, the penalty must be paid in full in order to satisfy the full payment rule. Id. at 1, 9. Defendant also asserts that plaintiffs' reliance on Humphrey and Noske is misplaced because the penalty in those cases arose under § 6700, not § 6707. Id. at 6-7.

---

[4] Plaintiffs, in their response, state that their combined OPS and FDIS strategies resulted in 192 transactions. Pls.' Resp. 5. However, in each of the charts that the IRS provided to plaintiffs breaking down the penalty calculation, a total of 193 clients was listed. See Pls.' Resp. Ex. 4 at 65-71. Further, during oral argument, plaintiffs' counsel stated that the correct number of transactions is indeed 193, and not 192. Oral Argument of Jasper G. Taylor at 1:27:48, July 29, 2015.

The threshold issue before the court is whether plaintiffs can establish this court's jurisdiction. Plaintiffs' jurisdictional theory can prevail only if the court accepts their argument that engrafts a new exception onto the full payment rule. The plain language of two pertinent statutes, 26 U.S.C. § 6111 and 26 U.S.C. § 6707, provides the legal basis for the IRS's imposition of the tax penalty and controls the outcome of this case. First, the court turns to 26 U.S.C. § 6111(a)(1), which requires that "[a]ny tax shelter organizer shall register the tax shelter with the Secretary [of the United States Department of the Treasury] (in such form and in such manner as the Secretary may prescribe) not later than the day on which the first offering for sale of interests in such tax shelter occurs." 26 U.S.C. § 6111(a)(1) (1994).[5] Further, "[a]ny registration under paragraph (1) shall include . . . information identifying and describing the tax shelter, . . . information describing the tax benefits of the tax shelter represented (or to be represented) to investors, and . . . such other information as the Secretary may prescribe." Id. § 6111(a)(2).

Next, the court examines 26 U.S.C. § 6707, which works in concert with 26 U.S.C. § 6111 by outlining, among other things, the consequences for failing to comply with § 6111. Under § 6707(a)(1),

[i]f a person who is required to register a tax shelter under section 6111(a)

(A) fails to register such tax shelter on or before the date described in section 6111(a)(1), or

(B) files false or incomplete information with the Secretary [of the United States Department of the Treasury] with respect to such registration,
such person shall pay a penalty with respect to such registration . . . .

Id. § 6707(a)(1) (1994 & Supp. III 1998).

In this case, the IRS imposed a penalty against plaintiffs pursuant to 26 U.S.C. § 6707 for failure to register their tax shelter, as mandated by 26 U.S.C. § 6111. Plaintiffs challenge the penalty imposed, but paid only a small portion of the penalty before filing suit. Specifically, of the $24.9 million penalty assessed against plaintiffs in this case, Mr. Haber has only paid $18,310, as well as $50 in interest, and DGI has only paid $15,450, along with $60 in interest. The respective amounts paid by plaintiffs fall far short of the $24.9 million penalty determined against them by the IRS. It is well settled that this court possesses jurisdiction over a tax refund case only if a plaintiff has fully paid the tax liabilities or penalties challenged. The United States Supreme Court ("Supreme Court") held in Flora v. United States that there is "no room for

---

[5] The court evaluates the parties' arguments in light of the statutory language that was in effect when the conduct at issue occurred, namely, plaintiffs' failure to register their tax shelter in 1999. Thus, the statutory language cited here for 26 U.S.C. §§ 6111 and 6707 reflects the respective versions of these statutes at the time that plaintiffs were required to register their tax shelter. Further, even if the court were to apply the current versions of the respective statutes, its analysis and the outcome would be the same.

contention" of the "principle" that taxpayers must "pay first and litigate later."  357 U.S. 63, 75 (1958) (citing Cheatham v. United States, 92 U.S. 85 (1875)).

Plaintiffs rely on the exceptions to the Flora full payment rule by advocating that those exceptions apply, by analogy, in this case.  Specifically, plaintiffs argue, when certain taxes or penalties are divisible, partial payment is sufficient to satisfy the rule.  Pls.' Resp. 15-16.  As examples, plaintiffs cite to the divisibility of excise taxes where a separate tax is assessed for each sale item, id. at 17, and the divisibility of payroll taxes because a separate tax is assessed for each employee, id. at 16-17.  Plaintiffs further describe how penalties assessed under 26 U.S.C. § 6700 for promoting abusive tax shelters are divisible, where a penalty is imposed for each activity described in the statute.  Id. at 18-19.  In cases arising under § 6700, if the plaintiff pays a portion of the assessed penalty, it confers jurisdiction on the court to hear the refund claim.  Id. at 16.  Plaintiffs contend that because their tax shelter consists of multiple separate transactions, or requires the filing of IRS Form 8264 for each transaction, the total penalty assessed against them is divisible by each transaction.  Id. at 19-21.  Consequently, plaintiffs argue, their partial payment of the penalty establishes this court's jurisdiction over their claims.  Pls.' Resp. 15, 17-19.

In resolving this question of first impression, the court recognizes that plaintiffs are correct that exceptions exist to the full payment rule; however, none applies to plaintiffs.  The United States Court of Appeals for the Federal Circuit ("Federal Circuit") has made clear in its binding precedent that "[e]xceptions to the full payment rule have been recognized by the courts only where an assessment covers divisible taxes."  Rocovich v. United States, 933 F.2d 991, 995 (Fed. Cir. 1991).  A tax or penalty is divisible when "it represents the aggregate of taxes due on multiple transactions."  Id.  Stated otherwise, divisible "taxes or penalties . . . are seen as merely the sum of several independent assessments triggered by separate transactions.  In such cases, the taxpayer may pay the full amount on one transaction, sue for a refund for that transaction, and have the outcome of this suit determine his liability for all the other, similar transactions."  Korobkin v. United States, 988 F.2d 975, 976 (9th Cir. 1993) (per curiam).  Thus, if a tax or penalty is considered divisible, partial payment is sufficient to confer jurisdiction on the court over the refund claim.  Rocovich, 933 F.2d at 995; Cencast Serv., L.P. v. United States, 729 F.3d 1352, 1366 (Fed. Cir. 2013) (stating that, "where a tax is divisible, the taxpayer may pay the full amount on one transaction, sue for a refund for that transaction, and have the outcome of this suit determine his liability for all the other, similar transactions" (citation and internal quotation marks omitted)).

There are limited circumstances in which a tax can be considered divisible and thus qualify as an exception to the full payment rule.  As noted earlier, one type of divisible tax is an excise tax because it is assessed on a per item basis.  An excise tax is "a tax imposed on the manufacture, sale, or use of goods (such as a cigarette tax), or on an occupation or activity (such as a license tax or an attorney occupation fee)."  In re DeRoche, 287 F.3d 751, 755 (9th Cir. 2002) (quoting Black's Law Dictionary 585 (7th ed. 1999)).  "Some examples of excise taxes [include] taxes upon liquors and wines and various manufactured goods which are introduced into commerce."  Bradford v. United States, 532 F. Supp. 292, 293 (D. Colo. 1981).  Because they "may be divisible into a tax on each transaction or event," excise taxes constitute an exception to the full payment rule.  Flora, 362 U.S. at 175 n.37; accord id. at 176 n.38.

As also identified herein, payroll taxes paid by employers are considered divisible "because they're assessed separately for each employee." Korobkin, 988 F.2d at 976; accord Fid. Bank, N.A. v. United States, 616 F.2d 1181, 1182 n.1 (10th Cir. 1980); Kaplan v. United States, 115 Fed. Cl. 491, 494 (2014). Penalties imposed for the failure to pay such taxes are "considered a cumulation of separable assessments for each of the employees involved, . . . permitting suit after payment of one or more employee's taxes." Fid. Bank, N.A., 616 F.2d at 1182 n.1.

Beyond these judicially created exceptions to the full payment rule, Congress has also allowed for some refund suits to proceed after a plaintiff has made partial payment of certain penalties. For example, 26 U.S.C. § 6694(c) provides that a tax return preparer may bring suit in a federal district court to challenge a penalty for underreporting a client's income after the preparer has paid fifteen percent of the assessed penalty. In addition, as plaintiffs note, suit may be filed to challenge penalties assessed pursuant to 26 U.S.C. § 6700 for promoting abusive tax shelters, or under 26 U.S.C. § 6701 for aiding and abetting an understatement of tax liability, if fifteen percent of the penalty has been paid.

Plaintiffs, however, are not on the same footing as any of the taxpayers described in the exceptions set forth above. The reason is plain: plaintiffs were assessed the $24.9 million penalty for failure to register their tax shelter–a single act. Although it is true that the IRS calculated the amount of the penalty based upon each client's aggregate investment in the tax shelter, neither the number of clients that participated in the tax shelter nor the number of commercial steps necessary to accomplish that participation triggers liability under § 6707. Consequently, the penalty is not divisible for any reason, including the number of clients who participated in the tax shelter.[6]

Further, prior to bringing suit before this court, plaintiffs filed an action in the U.S. Tax Court. See Markell, 2014 WL 1910052. The court takes judicial notice of those proceedings because that case provides a detailed example of the way in which plaintiffs created the pathway for their clients to participate in their tax shelter, either by means of an OPS or FDIS plan. In the case before the Tax Court, Markell Co., Inc., a corporation managed by Mr. Haber, challenged the income tax deficiency and penalty arising from an OPS plan–the same tax shelter at issue here.[7] In ruling against Mr. Haber, the Tax Court provided the following facts pertinent to its decision:

---

[6] Plaintiffs do not argue that the penalty at issue here was imposed for promoting an abusive tax shelter or for aiding and abetting an understatement of tax liability.

[7] Judicial notice of public records is appropriate when considering a motion to dismiss. See, e.g., Sebastian v. United States, 185 F.3d 1368, 1374 (Fed. Cir. 1999) ("In deciding whether to dismiss a complaint under Rule 12(b)(6), the court may consider matters of public record."); accord McTernan v. City of York, Pa., 577 F.3d 521, 526 (3d Cir. 2009) ("[A] court may take judicial notice of a prior judicial opinion."); Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006) ("[D]ocket sheets are public records of which the court could take judicial notice."); Wyser-Pratte Mgmt. Co. v. Telxon Corp., 413 F.3d 553, 560 (6th Cir. 2005) ("In addition to the allegations in the complaint, the court may also consider other materials that are integral to the

This case began when the Commissioner found the remains of a corporation on an Indian reservation in an extremely remote corner of Utah.  The tribe claimed not to know how the corporation's stock had ended up in its hands.  And there was little or no money or valuable property left inside the corporate shell.

All signs pointed to the corporation's manager, a sophisticated East Coast moneyman, as the key person of interest.  And his method was a series of complex transactions that bore a striking resemblance to Son-of-BOSS [which stands for Son-of-Bond and Option Sales Strategy] deals already examined many times before by this Court—but with a corporate-partner twist.

. . . .

The central player in this mystery is James Haber, a CPA and founder of Diversified Group, Inc. (DGI), where he was sole owner, director, president, and CEO.  He was also the director of Helios Trading LLC (Helios).  Haber is an exceptionally smart man, and exceptionally gifted in designing complex transactions.  A decade ago he designed what he thought was a way to use DGI and Helios to solve a very particular tax problem:  how to unlock the value lying in C corporations with low basis in capital assets by creating deals that generated enormous capital losses–losses large enough to offset the corporate-level tax on capital gains–and thereby largely eliminate corporate-level taxes.  He marketed this plan as the "Option Partnership Strategy" (OPS).  The OPS featured a contribution of paired options by a corporation to a limited liability company that was managed by a company of which Haber was president.  One part of the pair was a short option, and one a long.  The short option, in any reasonable economic view, is a potential liability.  But Haber and those who undertook similar deals claimed to adopt the position that the potential liability of the short option did not offset the potential of the long option, and so could be ignored as a matter of tax accounting.  That would, in turn, overstate the capital contribution and give the C corporation a tax benefit in the nature of a built-in capital loss on the sale of the C corporation's partnership interest.  To realize the benefit, the C corporation would resign from the partnership, take a transferred basis in the securities distributed to it in liquidation of its interest, and subsequently sell those assets at a huge loss–all due to the omission of the short-leg option.

Markell's brief admits that Haber had considerable experience with the selection, acquisition, and management of European-style digital options.  And Haber was a serial dealmaker, who did at least 12 of these deals as the president of DGI and Helios from 2000-2002.  But these deals caught the attention of the U.S. Attorney for the Southern District of New York–and though Haber has never been

---

complaint, are public records, or are otherwise appropriate for the taking of judicial notice."); Stahl v. U.S. Dep't of Agric., 327 F.3d 697, 700 (8th Cir. 2003) ("The district court may take judicial notice of public records and may thus consider them on a motion to dismiss."); United States v. Estep, 760 F.2d 1060, 1063 (10th Cir. 1985) (holding that a court may take judicial notice of court records of closely related prior litigation).

indicted or even made a target, he chose to plead the Fifth during the trial of this case.

Markell, 2014 WL 1910052, at *1 (footnotes omitted).  After close examination of the facts surrounding the transactions at issue, the Tax Court observed:

> This case is another of the Commissioner's battles against a tax shelter called Son-of-BOSS.  While there are different varieties of Son-of-BOSS deals, what they have in common is the transfer of assets encumbered by significant liabilities to a partnership, with the goal of inflating basis in that partnership. . . .  The liabilities are usually obligations to buy securities, and they are always contingent at the time of transfer.  Taxpayers who engage in these deals claim that this allows the partner to ignore those liabilities in computing basis, which allows the partnership to ignore them in computing basis.  The result is that the partners will have bases in the partnership high enough to provide for large noneconomic losses on their individual tax returns.  At issue here is an "outside basis" Son-of-BOSS deal:  the inflated basis is the partner's outside basis in the partnership.  The version here involves a corporation as the partner, and an intermediary transaction; namely, Markell's stock sale immediately followed by an asset sale.

Id. at *4.  Ultimately, the Tax Court held:

> We find that Markell had no intention to join MC Investments to share in profits and losses from business activities–it left after ten weeks and unwound the only transaction MC Investments ever made.  And that transaction was done through MC Investments only to move forward with a tax-avoidance scheme.  We find that the character of the resulting tax loss, and not any potential for profit, was the primary consideration Markell had in buying, contributing, and then distributing assets using MC Investments.

Id. at *10.

As outlined in the Tax Court's opinion, Mr. Haber designed the OPS and the FDIS plans, which he marketed though DGI as a tax shelter.  In this case, plaintiffs challenge the IRS's assessment of a $24.9 million penalty against them for failure to register those plans as a tax shelter.  Contrary to plaintiffs' assertion that the transactions that composed the plans fall into an exception whereby the tax or penalty is divisible, neither Congress nor the courts have determined that registering a tax shelter is susceptible to divisibility.  The reason for the declination is clear:  the failure to register a tax shelter is not comparable to the failure to pay an excise tax that is assessed on a per item basis for the manufacture, sale, or use of goods.  Nor is registering a tax shelter akin to payment of an employee payroll tax.  Aiding and abetting an understatement of tax liability under 26 U.S.C. § 6701 is also unlike the failure to register a tax shelter.

Moreover, while a penalty assessed pursuant to 26 U.S.C. § 6700 for promoting abusive tax shelters is divisible, it is wholly distinct from a penalty arising under 26 U.S.C. § 6707, a

different statute altogether.  There is no dispute that the penalty in this case arises under § 6707 for failure to register a tax shelter, and not under § 6700.  Consequently, plaintiffs' heavy reliance on the two cases referenced earlier herein, both of which concern § 6700–Humphrey, 854 F. Supp. 2d at 1301, and Noske, 911 at F.2d 133–is misplaced.  The court first examines Humphrey.  By way of background, in 1990, Congress amended § 6700.  Compare 26 U.S.C. § 6700(a) (1988) with 26 U.S.C. § 6700(a) (1994).  As the court in Humphrey described, "[u]nder the pre-1990 statute, a person who sold an abusive tax shelter owed a 'penalty equal to the greater of $1,000 or 20 percent of the gross income derived or to be derived by such person from such activity.'"  854 F. Supp. 2d at 1305-06 (quoting 26 U.S.C. § 6700(a) (1984)).  Before Congress amended § 6700, the Humphrey court explained,

> [c]ircuits were split over whether the penalty was divisible because of the indeterminate nature of the word "activity," as used in the statute.  Some courts reasoned that "activity" referred to an individual transaction rather than the cumulative tax shelter transactions, and therefore the . . . penalty was divisible because it was calculated on a per transaction basis.  For example, in Noske, a plaintiff was assessed a $186,000 penalty under section 6700 ($1,000 per 186 transactions), and jurisdiction was appropriate because the plaintiff paid $1,000 before suing, which represented a single portion of her grand penalty assessment. . . . Other courts differed, and held that "activity" referred to the cumulation of all the transactions, and thus (1) the $1,000 penalty "was a yearly minimum, not a per-transaction minimum," and (2) all section 6700 penalties were nondivisible because "[l]iability . . . based on total yearly volume is the hallmark of a nondivisible assessment." . . .  See, e.g., Korobkin, 988 F.2d at 977.

> The take away from the pre-1990 cases is that a section 6700 [penalty] was divisible when and because the word "activity" was construed as a single sale or transaction, and nondivisible when and because "activity" was understood as the cumulation of all sales or transactions.

> Congress ended the confusion over "activity" by amending section 6700 and clarifying that "activity" refers to an individual sale; and in so doing, Congress returned the penalty to its divisible state.  Compare 26 U.S.C. [§] 6700(a) (2011)[,] with 26 U.S.C. [§] 6700(a) (1985).

Id. at 1306 (footnotes and citations omitted).

The amended statute requires that a taxpayer promoting an abusive tax shelter "shall pay, with respect to each activity described in paragraph (1), a penalty equal to the $1,000 or, if the person establishes that it is lesser, 100 percent of the gross income derived (or to be derived) by such person from such activity." 26 U.S.C. § 6700(a)(2)(B)(2006).  Of significance was that the amended statute includes the following additional language:  "For purposes of the preceding sentence, activities described in paragraph (1)(A) with respect to each entity or arrangement shall be treated as a separate activity and participation in each sale described in paragraph (1)(B) shall be so treated.  Id. (emphasis added).  The effect of this clarification was evident in Humphrey. The plaintiff, a tax preparer, "sold" an abusive tax shelter, and therefore was assessed a penalty

under § 6700.  Humphrey, 854 F. Supp. 2d at 1302.  The court determined that, in light of the amended statute, because the plaintiff paid a portion of the divisible penalty that corresponded to at least one "sale" before filing a tax refund suit, the court possessed subject matter jurisdiction over her complaint.  Id. at 1305-06, 1309.

Because the decision in Humphrey concerned the sale or promotion of an abusive tax shelter pursuant to § 6700, and not to the failure to register a tax shelter under § 6707, it is inapt here.  Humphrey does not pertain to nor discuss any aspect of the failure to register a tax shelter.  In addition, Humphrey's discussion of the amendments to § 6700, outlined above, reveals how § 6700 differs from § 6707 with respect to divisibility.  Comparing the language of § 6700 and § 6707 (and, necessarily, § 6111) leads to the conclusion that although both statutes pertain to tax shelters, only the former is divisible, whereas the latter is not.  Previously, there was a split among the circuits when interpreting whether the penalty under § 6700 was divisible, which prompted Congress to amend it in 1990.  The amended statute expressly provides that the penalty imposed for selling or promoting an abusive tax shelter, based upon the activities within the tax shelter, is divisible, outlining that "each entity or arrangement shall be treated as a separate activity, and participation in each sale . . . shall be so treated."  26 U.S.C. § 6700(a).

By contrast, there is no split among the circuits regarding the divisibility of a penalty under § 6707 that would require Congress to amend the statute.  Rather, § 6111 states that "[a]ny tax shelter organizer shall register the tax shelter with the Secretary [of the United States Department of the Treasury]," providing "information identifying and describing the tax shelter, . . . information describing the tax benefits of the tax shelter represented (or to be represented) to investors, and . . . such other information as the Secretary may prescribe."  Id. § 6111(a) (1994).  Further, § 6707 states that "[i]f a person who is required to register a tax shelter under section 6111(a) . . . fails to register such tax shelter . . . or . . . files false or incomplete information with the Secretary with respect to such registration, such person shall pay a penalty with respect to such registration."  Id. § 6707(a)(1) (1994 & Supp. III 1998).  Unlike § 6700, neither § 6111 nor § 6707 contains the word "activity," a term that some courts found to be ambiguous with respect to whether the penalty arising thereunder was divisible.  Nor do § 6111 and § 6707 contain any similarly equivocal term.  Indeed, the fact that Congress amended § 6700 to state that the penalty was divisible, but made no such amendment to § 6707, despite both statutes pertaining to tax shelters, indicates that the penalty for failure to register a tax shelter under § 6707 was not intended to be divisible.

Similarly, as with Humphrey, plaintiffs' reliance on Noske is inapposite.  In Noske, the United States Court of Appeals for the Eighth Circuit reversed the United States District Court for the District of Minnesota's dismissal of the plaintiffs' complaint.  911 F.2d at 136.  Previously, the plaintiffs were assessed a penalty under § 6700 for promoting abusive tax shelters, and paid only a small portion of that penalty before filing a tax refund suit in the district court.  Id. at 134.  The district court dismissed the case for lack of subject matter jurisdiction because the plaintiffs had not satisfied the full payment rule.  Id.  On appeal, as described earlier, the court interpreted § 6700 as it existed prior to its amendment in 1990, when the ambiguous nature of the term "activity" in the statute caused circuits to split in determining whether the penalty was divisible.  Id. at 136.  Consequently, the court in Noske held that the plaintiffs having paid only part of the penalty before filing suit did not divest the district court of

jurisdiction.  Id.  In this case, plaintiffs' citation of Noske is unavailing because the court's determination that the penalty was divisible pertained to § 6700 and not to § 6707.  Moreover, § 6700's use of the term "activity" was previously ambiguous as to whether the penalty was divisible, requiring Congress's clarification.  Because there is no ambiguity in § 6707, the court finds unavailing plaintiffs' reliance on Noske to support their view that the statute is divisible.

Indeed, the tax penalty at issue here is not susceptible to divisibility because a § 6707 penalty is not assessed based upon the sum of transactions that participate in the tax shelter.  To the contrary, the penalty is levied for the failure to register a tax shelter with the IRS–a singular act.  As the Federal Circuit has explained, whereas the aggregate of taxes due on multiple transactions can constitute a divisible tax, a tax or penalty that arises from a single event is not divisible.  Rocovich, 933 F.2d at 995.  Although it is true that plaintiffs carried out 193 transactions–one for each client to enable the client's participation in plaintiffs' tax shelter–the penalty under § 6707 was imposed solely for the failure to register the tax shelter, as a whole.  Logically, divisibility cannot apply because individual transactions that participate in a tax shelter are not registered.  There is no § 6707 penalty imposed on each transaction, in the way that a separate tax is imposed on each sale item in the context of an excise tax, or for each employee within the realm of payroll taxes.  Thus, because the individual transactions that participate in a tax shelter are not registered, the penalty is not divisible and the full payment rule applies.

Nor does the court find persuasive plaintiffs' argument that the requirement to file a separate form for each transaction within the tax shelter renders the penalty divisible.  Specifically, 26 C.F.R. § 301.6111-1T, an IRS regulation, expressly states:  "[a] penalty [is incurred] for failure to register a tax shelter."  26 C.F.R. § 301.6111-1T at A-2.  The regulation explains that a separate form "must be completed for each investment that differs from the other investments in a substantial manner with respect to" principal assets, accounting methods, federal or state agencies with which the investment is registered or with which an exemption notice is filed, methods of financing the purchase of an interest in the investment, or a tax shelter ratio.  Id. at A-48.  This regulation explicitly states:  "[s]uch aggregated investments, however, are part of a single tax shelter."  Id.  Thus, the number of transactions or investments constituting the tax shelter, or the obligation to file a particular form related to each transaction, are distinct from the requirement to register the tax shelter, itself.  Accordingly, these separate transactions or forms are irrelevant to the imposition of the penalty for failure to register the tax shelter.

Finally, the court notes that the exceptions to the "jurisdictional rule for 'divisible' assessments" are decidedly "narrow," and only apply to the limited circumstances described above.  Korobkin, 988 F.2d at 976.  In Rodewald v. United States, the plaintiff had previously entered into an installment agreement with the IRS to settle his tax liabilities, and after paying only some of the installments, filed a tax refund claim.  231 Ct. Cl. 962 (1982).  The United States Court of Claims, whose precedent is binding on this court, in discussing exceptions to the full payment rule and declining to "carve an additional exception," dismissed the plaintiff's tax refund case because he had not fully paid the tax liabilities assessed against him.  Id. (discussing exceptions to the full payment rule, including excise and payroll taxes, and dismissing the case).

Based upon the unambiguous language of the pertinent statutes, regulation, and binding precedent, the court rejects plaintiffs' argument that it should further broaden the divisibility

exceptions to the full payment rule.  See Rocovich, 933 F.2d at 995 (holding that although Congress enacted some exceptions to the full payment rule, because the plaintiff could "point[] to no authority for making" the specific type of exception that he sought, one could not be created); accord id. ("While the Flora rule may result in economic hardship in some cases, it is Congress' responsibility to amend the law.").  Accordingly, because plaintiffs have failed to pay the full penalty before bringing suit in this court, and do not satisfy any of the exceptions to the full payment rule, the court lacks subject matter jurisdiction over their complaint, and dismisses it pursuant to RCFC 12(b)(1).[8]  Int'l Custom Prods., Inc. v. United States, No. 2014-1644, 2015 WL 3953705, at *5 (Fed. Cir. June 30, 2015) ("The Supreme Court has also held that pre-payment of monies owed similarly conditions the government's waiver of immunity. . . .  The Court has yet to question the validity of such a condition."); Rodewald, 231 Ct. Cl. at 962 ("[The] taxpayer has not satisfied the procedural prerequisites to a refund suit because he has not yet paid all of the installments . . . [w]e conclude that, as of now, we lack jurisdiction to hear the claim and must grant the government's motion to dismiss.").

## V.   CONCLUSION

Because plaintiffs have failed to satisfy the full payment rule, the court lacks subject matter jurisdiction over their complaint.  Accordingly, the court **GRANTS** defendant's RCFC

---

[8]  Plaintiffs also contend that they are entitled to a refund, that the tax liability was incorrectly calculated, and that any uncollected assessments of the penalty should be abated, among other arguments.  Because this court lacks subject matter jurisdiction over plaintiffs' claims, its inquiry is complete.  Once a court recognizes that it lacks jurisdiction over a complaint, the only permissible action that it can take is to dismiss the matter pursuant to RCFC 12(b)(1).

Further, even if plaintiffs had satisfied the full payment rule established in Flora, the court could not grant the injunctive relief requested; namely, to enjoin the collection efforts of the IRS.  As described earlier, the court lacks authority to issue an injunction of the type sought by plaintiffs in this case.  See Bowen, 487 U.S. at 905 & n.40; accord 26 U.S.C. § 7421(a) (1994 & Supp. IV 1999) ("[N]o suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person . . . ."); Bob Jones Univ. v. Simon, 416 U.S. 725, 737-37 (1974) ("The [Supreme] Court has interpreted the principal purpose of (the [Anti-Injunction] Act) to be the protection of the [g]overnment's need to assess and collect taxes as expeditiously as possible with a minimum of preenforcement judicial interference, and to require that the legal right to the disputed sums be determined in a suit for refund." (citation and internal quotation marks omitted)); Jones v. United States, 889 F.2d 1448, 1449-50 (5th Cir. 1989) (explaining that the Anti-Injunction Act provides that once a tax has been assessed, a taxpayer is powerless to prevent the IRS from collecting that tax); Stiles, 47 Fed. Cl. at 2 ("Under the Anti-Injunction Act, I.R.C. § 7421, plaintiff is prevented from bringing suit for the purpose of restraining the assessment or collection of any tax. . . .  [O]nce a tax has been assessed, a taxpayer is powerless to prevent the [IRS] from collecting that tax." (citation and internal quotation marks omitted)); Sanders v. United States, 34 Fed. Cl. 38, 48 (1995) (stating that the Anti-Injunction Act does not contain an express waiver of sovereign immunity against the United States).

12(b)(1) motion to dismiss.  Plaintiff's complaint is **DISMISSED WITHOUT PREJUDICE**. The clerk of the court is directed to enter judgment accordingly.

      **COSTS TO DEFENDANT.**

      **IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge